On behalf of the Avalon Cross Athlete, Mr. Timothy P. Dwyer. On behalf of the Athlete Cross Apprentice, Mr. Stanley B. Eisenhower. Thank you. Mr. Dwyer, as you can see, Justice Enoff is not here. She wasn't able to attend because of some medical problems in the family. However, she will be listening to the oral arguments from or on the Supreme Court website. She will be able to participate, although it will be after the fact. Thank you, Your Honor. You're welcome. You may proceed. Thank you. If it pleases the Court, Timothy P. Dwyer on behalf of the appellants, J. Lyle Clark and Stephen Schultz. My learned adversaries, Mr. Eisenman and Ms. Mueller. Your Honor, the issue today before this Court is whether the Circuit Court fashioned a correct remedy in the context of the mandamus claim that the plaintiffs put forward after this Court had remanded the case for a mandamus claim before the Circuit Court. Fortunately, we have the benefit of a 20-page opinion in order. Very well written, I thought. Thank you, Your Honor. I'm talking about my opinion. And I was talking about the trial court opinion. But, Your Honor, I certainly appreciated your first opinion. In any event, it's impossible to go through the Court's modified opinion in order dated September 18, 2013, and not contest the findings that the Court made. That, A, that the school district was required to develop a SIP, that they didn't do that. And that the requirements for that SIP or that revised SIP or that corrective action plan, whatever you call it, none of the elements were in there. And the entire intent and purpose of the school code was circumvented. And when you read that opinion in order, it's impossible not to come to the conclusion. Did the Court enter an order that within six months the school district was supposed to start a SIP or SIP proceeding? Did I misunderstand? No, Your Honor. You don't misunderstand. Again, I think, more specifically, the Court ordered the school district to institute a corrective action plan or a revised SIP within six months, which would have been March 18. And the school board developed a plan on March 10, 2014. That plan is now, because the circuit court retained jurisdiction to enforce its order, that plan is now the subject of a rule to show cause as to why the district is not in contact with the court. They have filed the same motion that they filed to this court saying that, you know what, this issue is moved. We got a waiver on April 18 from the ISBE, or more specifically, the state of Illinois received a waiver from the federal government on April 18. And therefore, none of this stuff has any more relevance. There's no longer a controversy in this case. Unfortunately, Your Honor, I blew up my back last week and I wasn't in the office. I got this motion on Tuesday. If I could have until next Tuesday to file a formal response, I would really appreciate that. But I think I'm going farther than your question. And your question was, did the court order something? And absolutely the court did. And what the court did is, and it's really in its two-page motion for clarification order attached to the 22-page order, what the court said was that, you know, in the absence of any case law saying anything else, I'm going to put the regulation back on track where it fell off the track. The court recognized that Richmond School had failed AYP for six consecutive years. And under the regulations, it was absolutely clear that the school, that the district would have to undertake a major restructuring, which is significant and costly. There are only four options under the code, none of which are pleasant to anybody. So the circuit court said, you know, I realize that under the code, that would be the remedy. However, I think the better view is to bring it back where it fell off the track in 2011. Therefore, I'm going to order that they institute a corrective action plan. And it specifically said what that plan had to include. If you read the court opinion, it says, you know, the plan did not include this, this, this, this, and this. And there's literally nine or ten elements that are required. And quite frankly, the corrective action plan they devised isn't even a plan at all. It has none of those elements. It doesn't refer back to the 2009 steps. It's incredible. And now they come before both courts and say, you know, the issue is moved. We're done. We got our waiver. During the course of this litigation, everybody knew that the NCLB sunsets at the end of the school year. The goal of the school district was to get the litigation to the end of the school year and say, well, it's no longer applicable. We're all good. We don't have to do anything. It's incredible. And the whole time, you know, the administration comes to the circuit court and they testify about how they're, you know, they want to be transparent and they're concerned about the kids. Well, that raises a couple of really relevant questions, I think, for this court. The first one is, when they adopt their plan on March 17th, 2011, if their plan's in compliance with the law, why do they have a second vote as to whether or not parents can opt out? It makes absolutely no sense. I've never heard of a school district doing a boundary reconfiguration and saying, well, you know what, but if you don't like it, you can opt out. That was a joke. It was an in name only. There was no, the administration, I don't know what the board knew, but the administration, the people who know the law about what happens and what's required in the state of Illinois, knew very well that Richmond had failed AYP for three years straight and was going to fail for four years straight. So they knew that they had a problem. The only way to get rid of that problem was to commingle the schools. That was the nucleus. That was the cornerstone of the whole plan. Dr. Shulman testified as such in the case. He said, after we solved the facilities issues, then we sat down and we thought, what's better for all the kids? He also said, I don't care about AYP. Counsel, I'm not sure that you need to address this, at least now, because your appeal relates to whether or not the remedy that was granted is appropriate. And I think you're going back and you're arguing the merits of why the trial court was originally reversed and this court determined that Mandamus could issue if, in fact, the facts that you were alleging or could allege or did allege in the pleadings that you had on file stated a cause of action, which if the trial court made findings of fact in your favor, you'd be entitled to a writ of Mandamus. So much of what you've been saying seems to me to be related more to the prior appeal than what is before us. What's before us, in my opinion, for purposes of your arguments as an appellant, is the trial court erred in what it did and this is what it should have done. And don't tell me about what happened three or five years, except in the context of that what happened three or five years ago should happen now. Your Honor, I completely understand your point. For purposes of clarification, I was just trying to tell you what actually happened at the trial and the judge recognized these issues and they're in his findings of fact. And basically, if you go through the first 17 pages, the trial court basically said that the school board and the district violated the law in such and such and such and such a manner. It's right there in black and white. I don't need to repeat that for you. So I think you're right. And the question is, well, what is the remedy? Well, in the context of a mandamus, the trial court can't say, I think the better view is to, you know, pick up the train where it went off the tracks. Because what happened... Well, you've already said that. The question I then have for you is, do you think the train should go back to the station or do you think it should be put back on the tracks where it's at and proceed forward? Your Honor, I think there's... Now, you've already argued in part in your briefs that you want the schools to be placed in status quo ante, which would infer, at least to me and I think my colleagues, that you want the train to go back to the station, pick up the passengers anew, or spread the passengers amongst the two stations as they should be, and then start out again from the two stations, so to speak, or the two schools. Yes, Your Honor. That certainly... I think there's two options. And that's one option. I think it's difficult to read the first 16 or 17 pages and not come away with a finding that what the district did in this case was patently illegal. So would the court have the power to undo that and put the train back in the station? Absolutely. The alternative is with a finding that Richmond School, regardless of the boundary reconfiguration, was subject to the provisions of the Illinois School Code, had to undergo a major restructuring. Which essentially might be the same thing, but there would be some discretion there with the school district to maybe start a charter school, bring in a private entity, or basically fire all the people associated with the school and start over. So you're saying the net result then of that is leave Davis alone, leave it the way it was, or put it back to the way it was, make Richmond something different and unique and all this going forward. Is that what you're saying? I'm saying that that's a possibility that the district could do. Your Honor, it's not that black and white, unfortunately. What is black and white is that the district violated the law. And the district has come to this court and said, you know what? Wait a second. Under Tyska and the fact that the NCLB and the Illinois Court says there's no prohibition for this boundary reconfiguration, so it's discretionary. That's patently untrue. And the trial court found that. But you know what? Now, if the district follows the procedure that's outlined in the school code and goes through and if they engage the parents, if they talk about scientific and measurable objectives, if they prepare a plan and make a budget for that plan, and if they go through those steps, then and only then do they have the discretion to implement various things. They bypass the whole thing. So, unfortunately, Your Honor, I can't answer your question as a yes or a no because there is some gray involved. But the fact of the matter is that the district never got to the gray. They just disregarded the process. The way I'm reading your argument or your statements is that there are some procedural pro forma steps that have to be taken in the nature of studies or hearings, collaboration with parents and whatever. Once those things are completed pursuant to the regulations of the state code, then the school district has some leeway or some discretion as to how it is going to resolve the problem. Absolutely. Absolutely. And the procedure was completely bypassed. And it was bypassed, Your Honor, to shortcut the process. I mean, what they had was, and I'm sorry, I've got to go back to the evidence at trial because it's important. You know, and the judge found it. He said, you know, when the administration personnel testifies that AYP was not a factor in their decision to committal these schools, that's simply not credible. I mean, the alternative is that they'd be incompetent. But by their own writings, they submit it to the public. So how did we get here? And they said, well, Richmond failed AYP for three years and 117 students left. And unfortunately, it was the wrong students. I mean, the NCLB and the school code is devised so that if there are subgroups failing at a school, you give the parents notice and those kids can go to another school where they get the right attention. But in reality, what happens is that the parents with the good students say, I've got to get my kid out of the school. And that's what happened. So the district had a real problem. They had a real problem. But what did they do? Did they go to the parents and say, listen, we've got a real problem. We need to address this issue. No. They sat down in private in the fall of 2010, adopted a plan, waited until February 9th, did a robocall, and then shoved it through in five weeks. Could the alarm go off now? Oh, I'm sorry. Is that my time here? Yes. Thank you. You'll have an opportunity to make rebuttal. Thank you. Mr. Eisenhammer? Yes. Have you ever heard of Robert Burns? Yes. Scottish poet. He wrote a poem, I believe, about a female field mouse. I believe there's a clause in there about the best laid plans of mice and men go awry. I know that quote very well. Mr. Dyer seems to be touching upon that to suggest that the school district's plans didn't go off as well as a field mouse's might have gone. And your public brief is arguing that the, I think you're still arguing, correct me if I'm wrong, that your client has the inherent authority to move students around. And if it just happens to work out that it increases the grade point average at Richmond and resolves the problem with AYP, that it works. Is that my understanding of your argument? The argument? No. Okay. Not necessarily. Let me maybe get to it, because I guess that was one of the issues. I think you raised in our argument, if I wasn't here in our argument, the last time. And while I thought your opinion was well written, I thought it could have been better written because you could have decided our way. But that's what our argument is. We can't please everybody all the time. Right. What I think you're saying is the question is, did we comply with NCLB? And NCLB or the state, actually, more particularly the state regulations implementing NCLB. That turns on the issue of when we reconfigured the schools, whether that, in a sense, because of reconfiguration and the other things that we had done in the reconfiguration, because we did replace the staff, we did extend the school day, we did institute the new curriculum, that that constitutes, under the federal regulations and the state regulations, a new school that would allow us to reset the clock on AYP. Because under the state regulations, which we call, I think, page 26 of our brief, if the state finds that there is a new school, which they did find here because they granted us a waiver, you reset the AYP at the lowest status of one of the two schools. The court there found you can't do that. What do you mean lowest status? So in that case, Davis was in the first year of not making AYP. Richmond was in the fourth year. So if you restructured it, it would be one year. So we're not getting out of it. We're not changing it. And whether that change, so the status is set. So by reconfiguring it, it doesn't mean all of a sudden, I think, we're back to nothing. We don't have to do anything. One, we're set at the lowest AYP. And two, we still have to comply. And in this particular case, where I can talk about generally, in this particular case, where both schools were not complying was with its subgroups. So even if we could say, if it's possible that you look at AYP on the school basis, and let's say Davis had so many more kids than on a general basis they began to make AYP, we weren't making AYP with all the other subgroups. So we were still, it wasn't like this was trickery that we're trying to get out of it. We still were subject to the AYP of the subgroups.  And the other thing is Davis, by the way, was not failing. It was not a failing school because it didn't have enough students. They have some, you have to have 45 kids in a subgroup. If you don't have 45 kids in a subgroup, you're not, then you're okay. Even if, in that particular school, all 44 kids have been failing. This is one of the vagaries of, this is one of the vagaries of NCLB. The district didn't make this up. The state didn't make this up. The federal government made it up. Are you suggesting that if you are not a member of a subgroup, you can fail and the government isn't concerned? I mean, that's... No, they are. They are. But I'm saying... But the remedies aren't the same because it's only if there's a subgroup that's failing that these remedies kick in? No. If this whole school is failing and you have no subgroups,  Most schools in Illinois... So if you have a subgroup that's failing, even though the school, on total average, is passing, you're still... You're failing. You're failing just like if the whole school was failing. And it's one of the vagaries of the NCLB. It's not something the school came up with. And it's regulated by the state. And in this case, the state gave us a waiver to reset it. Well, when you say it's regulated by the state, is it regulated by the state or is it legislated by the state legislature to the extent that the federal government basically told the states to do whatever it wanted relative to coming up with compliance such that the test that the federal government formulated would be passed by whatever subgroups or schools or whatever that would be taking them and that the state of Illinois passed a school code or at least segments of it that set up the procedures that Mr. Dwyer was talking about for determination of what should be done preliminarily and then what should be done after the preliminaries are done such that hopefully nobody would fail. Those procedures are mandated by the federal government in order to get federal monies. The state adopted those procedures. They didn't have, at least with the specific procedures with respect to AYP, corrective action plans, and so forth. The state didn't have discretion. They had discretion on what kind of tests they would use, whether you do the ACT or you come up with your own tests. So as it turns out, we've come up with, in Illinois, very strict standards in testing while other states haven't. And this is, as it came back, is what I think this Court was concerned about, is that, again, the vagaries of NCLB, how, you know, it's possible, as Mr. Dwyer was talking about, if we allowed choice, which we did allow, if all the kids in the subgroups, or some of the kids in the subgroups of Richmond transferred to Davis enough so they would go over the 45-minute limit and Richmond would go down below, we'd have a situation where Richmond now would be not failing and Davis wouldn't, and the schools are exactly alike and not changed, which is one of the reasons why the federal government recognized that there needs to be a different process and instituted the waiver process, which the state received. I interrupt you because it has something to do with your arguments, I think, and that is that when I read your brief, I didn't get the impression that you were attacking the factual findings that the trial court made so much as the conclusions of law. And if I'm wrong, then please tell me what factual findings that the trial court rendered you believe are against the manifesto of the evidence. I would say I think the trial court, at least with respect to ordering us to do the plan, because we are the appellee here and we're satisfied with the order in a sense. But you're also a cross appellant. Cross appellant. You're attacking the actual order. Right. And so if the writ was wrongfully issued, it was either because you disagree with the factual findings when applied by the law that the trial court interpreted would render an improper judgment, or whether as a matter of law, regardless of his factual findings, that the writ should not have been issued. Now, I can easily accept the argument that when the federal government recently did something, that you can argue that things are moot as a matter of law. But right now I'm concerned about your cross appeal and whether or not the writ should or should not have been issued in the first instance. And the way your briefs read, I don't see you saying that the findings were against the manifest weight, which means I want to make sure that I'm reading you correctly. I think it's mainly that there is errors of law, but maybe it's combined findings of facts and law in this particular case. Because, for example, I think our cross appeal turns on the issue of whether we did enough in the schools that it would be considered a restructuring of the school, sufficient that the state would be allowed to reset AYP at Davis' AYP. And that is both a question of fact and a question of law. A question of fact with respect to, as you read the regulations again on page 26, is whether we did enough to have restructured that it would be considered a new school, which the state agreed, and which we would argue that was a discretionary decision. And then two, a question of law, which was basically, you said, the state doesn't have the authority to grant that waiver even if it was totally restructured in order to reset. So it's both a question of fact and a question of law. What were the facts that you disagree with? That your witnesses, your client, was less than credible? I don't think it mattered. I guess maybe that I don't. Because I don't think it mattered. This is an objective issue. Does it? The issue is, at that point in time, what were we supposed to do? We restructured, whereas nothing in the NCOB says we can't restructure, we can't change the school, we can't change out the teachers or do that. The question is, were we required to do a corrective action plan at that point, which is what the judge found we didn't do, that whatever we did wasn't sufficient to be a corrective action plan? Didn't you argue on the first appeal that what you did was, in fact, a corrective action? Didn't we reverse and remand it for the possibility that if the allegations were established that your claim that this was, in fact, a proper reorganization was incorrect? To me, there's some aspects of this appeal, the Alicia Cross appeal, that strikes me as being antagonistic towards the law of the case, because the first appeal found that there was a possible, well, found that there was sufficient facts alleged that, if proven, would entitle the plaintiffs or petitioners to a writ of mandamus. So, essentially, you found that, as a matter of law, it stated a cause of action. And in your cross appeal, it seems to me you're still arguing that, regardless of what the facts are, it didn't state a cause of action because you did what the statute required, which means you didn't do anything illegal. No, we did. All right. I mean, that's the case. Okay. Let me see if I can put it in a different way. I think what I'm saying is, at the time the district reconfigured the two schools, Richmond had failed, and we agree on this, then we can talk about what we agree upon. Richmond had failed, AYP, for four consecutive years. Absent anything else, absent anything that we do, we would, under NCLB or those same regulations, we would have to do basically three things. Adopt a corrective action plan. We're not disputing that. Or, and allow choice and provide supplemental educational services. Absence anything else. And, clearly, we were failing four times. But the district reconfigured the school, which is not, there's nothing that prevents the district from doing it at that time. Then there's an exception, which is, if that reconfiguration became, in a sense became a new school based on the state, what the state defines as a new school, then we wouldn't be required to do a correction active plan or provide choice or whatever, because we would be under Davis' AYP, which was the first year, which wouldn't require that. The state. If you got an exemption from the Board of Education, why would you need to reconfigure the schools? No, we were required, in order to get the exemption, because, in other words, you can reconfigure the schools. There's nothing, again, there's nothing in NCLB that prevents that doing it. Your opinion didn't cite any statute. He hasn't cited any statute. We still are free. NCLB allows districts to do things to their schools. If they reconfigure and it meets the standards of a new school, then the state board can grant an exemption. And we were arguing, and the state did grant that exemption. The trial court, in its opinion, it looks like said that they didn't have the legal authority to grant that extension. So I guess we're not fighting over the facts, because we never got to the facts on that. Nor was that an issue, technically, that was argued in the appellate court, because we were on a motion to dismiss and all facts were taken as true, and there was no allegation of the exemption and so forth. So it's consistent with your opinion, as facts that were brought out at trial. So are you saying that the ISPE granted the exemption because of the reconfiguration of the schools? Yes. Would it be reasonable to assume that had there not been a reconfiguration, there wouldn't have been an exemption? Yes. At least for Richmond. Because the schools would be separate. Without the exemption, would they have had to formulate a SIP plan? A corrective action plan, yes. Is that corrective action? Right, and that's the reason, you know. So you're saying they had this other alternative, in addition to doing a SIP plan, they could just do this reorganization. And it wouldn't get us out entirely, because we were moving on Davis's timetable, which if they failed in the second year, they would have had to do a SIP plan. Now, this alternative that you're speaking of, though, the reorganization, where then after the fact you seek an exemption, is that specifically authorized in the statute? Yes, yes. Again, on page 26, there's the informal guidance by the federal government, which says that you can reset it, but it's based on what the state law is. Then we come from the state regulations that say if you do enough, we'll give you the exemption. I mean, it's not automatic. Neither one says it's automatic. You have to do more, and both of them say you have to do more than just mix up the schools. And in this case, the evidence did show that we did more. You know, we extended the school day, we had a new curriculum for science and technology, and we replaced the staff, which is very, very close to doing a whole formal restructuring that happens six years later, that would happen after six years. What about your motion to dismiss because of mootness? It's moot. It's moot. This state has been granted a waiver from NCLB. There are no longer any requirements to meet AYP, and there are no more requirements to meet corrective action plans. How can the Federal Department of Education abrogate statutes to the extent that if the Congress passed No Child Left Behind, how is it that the Department of Education can essentially abrogate it or void it? By granting an exemption and essentially telling the states that they no longer have to follow the federal legislation. Well, one is that I'm not quite sure if... I'm happy they got the exemption, so I didn't go quite as far as they have. But I can tell you, one, there's two theories. One is that there's enough authority in the law to allow them to do that, and two, they get on the waiver on the basis that there's enough authority in the law to allow there's enough authority in the regulation. The other question I then have is, assuming, arguendo, that the Federal Department of Education has the authority to abrogate a federal statute and the state of Illinois enacted a statute or enacted portions of the school code in compliance thereto, if, in fact, they're granted an exemption, would it not seem reasonable that the legislature should decide whether or not it will repeal its own statutes consistent with that exemption, as opposed to giving the ISPA the authority to decide whether or not the school code should or should not be enforced? I think the answer is the law was implementing a federal... This is a spending clause issue where we've implemented to get state funds. The state law clearly implements NCLP, not the specifics, but the regulations. And I think the state has the authority to grant a waiver consistent with the federal government. And they did it based on the state demonstrate... It's not just we're giving you a waiver because, you know, this is Obama's home state, for example. They got it because all states were required to... Is that an admitted fact by Mr. Dwyer that the state of Illinois is Obama's home state? No, but there's been plenty of talk about it. Why haven't they gotten the exemption? There were a couple of things. There was funding to race to the top. Illinois was, you know, delayed on. And now this. And there were four things that they were required to do in order to get the exemption, one of which is to come up with an evaluation system for teachers and principals that was based on student achievement. The other thing is that assuming that the exemption... Well, I'll ask it a different way. This exemption, is it retroactive or is it futural? It's... I'm not sure. It is in place now, which relieves every school district who are with either a corrective action plan or any restructuring plan. Would it be more correct to say that as of today, there is no more AYP? There is no more reason to even call them subgroups? Technically, that's correct. There really is no reason to even have testing any longer for purposes of funding? Well, in ACLB, that's correct. That's correct. Now, assuming that that's all true, how does this affect whether or not Richmond and Davis should have been split up or reorganized? Because that's in the past and this is something that relates to the future. Because NCLB doesn't govern whether or not a school district can split up schools. Just doesn't. That's within the authority of the school district. How it impacts NCLB does. But this is a waiver granted to everybody. It isn't a waiver for everybody but St. Charles. Nor is it a waiver for anybody who in the past was not compliant. It's a waiver of every school district in the state. So how many children are being left behind? Do we have any idea? If you ask me my opinion. But none. This law was flawed from the beginning. And I think the questions you've raised about it and I think some of the answers I think I gave go to that issue of the fact that one size doesn't fit all with respect to that. That the whole idea that I can magically change a school by changing the teachers and not the students causes problems. Which is the reason for the waiver. The reality of it is that by moving the children between the schools results in a statistical analysis that suggests that everything is copacetic when in fact the same children apparently are getting the same education they got before except they're getting it in some instances at least half of them in a different loci or locus. And so when you say that there's a problem there definitely is in the sense that if there's supposed to be some reasonable exercise of the police power in order to reasonably achieve a beneficial result it seems ironic but what the school district did really had no beneficial effect. Maybe the extra hours and maybe firing the staff might have had some effect but if these kids are still getting the same grades but they're statistically different because they're now in a different grouping then you talk about a frustrated situation or a frustrating situation. I know my time is up can I be just permitted to give that answer? Sure. I think with respect to NCLP on a whole your concerns are valid but in this particular case there was attempts and it's in the record to make these schools better and there was no attempt to use statistical mess ups in order to just get yourself out of NCLP because it was clear that the subgroups would still unless they improved would still and not by statistics would still have the problems would still be there with the subgroups. And you're absolutely correct that's the problem with this law. It focuses on I think your concerns are with the law and how this law operates as opposed to this specific thing because these issues can be repeated in many different places and we can have many different problems just by changing schools wind up with many different problems. Could you say to a place where the legislature has given the ISBE the authority to exempt school districts individual or collectively from statutory enactments by the legislature? Well they have allowed waivers that are granted by the state so there is a waiver process. Well my point is is there somewhere in the school code authority granted the ISBE to waive the requirements of the six that are set forth in the school code? In this particular case well yes in the case of a new school. In the case of what? In the case of a new school. And this goes to the state has the regulatory authority to set what is a new school what is compliance and what is not compliance within their regulatory power. And if the legislature believes and there is a process if the legislature believes that it is the agency is exceeding its authority with respect to its regulatory power they can act to deal with that. Is there anything else you want to cover? I would love to cover more but thank you very much you have gone way beyond my time. Thank you. Mr. Dwyer. Thank you counsel. Thank you Mr. Justice. First I'd like to quote from page 18 of the trial court order. Our school code authorizes ISBE to waive or modify mandates within the school code and administrative rules and regulations 105 LCS 5-23.25 G but specifically provides quote waivers may not be requested from laws, rules or regulations pertaining to or from compliance with the No Child Left Behind Act. Justice Spence I think that you asked Mr. Eisenman does the law specifically authorize does the statute specifically authorize an exemption and the answer is yes. In fact it's absolutely no. Now the counsel has come up in his brief with a couple of guidance documents that they didn't submit at trial which the assistant superintendent referred to in her testimony as a brochure and now he's saying that these things have the force of law. We don't know when they're written. We don't know who they're written by. There's no foundation. They weren't introduced at trial and now he's sitting up here and telling this court that yes the ISB is expressly authorized by statute to exempt us from an NCBO regulation when in fact the opposite is completely true. I mean that is just unacceptable to get up there and represent that to this court. The idea about a waiver and a new school was expressly rejected by the trial court and the trial court cited the testimony of the ISB experts who said there is no definition of a new school either federal or state. We don't really know what a new school is but you know what Richmond could be a new school. The counsel got up and said you know what we did all these we extended the day we replaced the staff. Of course you replaced the staff. You changed the grades. You switched the teachers around. I mean they had it done 11 days after they adopted the plan. He got up here and said you know what when we adopted the plan Davis had failed for one year. Not true. They adopted the plan on March 17, 2011. Davis had no failure whatsoever. Richmond had three years. They knew Richmond was going to have four years. So they judge you asked you asked the individual they said could you have gotten the exemption without the reconfiguration and the answer was no. That is the one truthful statement as a matter of law that was set up here. That is the whole basis the whole cornerstone for the circumvention of the whole corrective action plan of an evasion of the major restructuring that they were looking at. You know it's ironic that the school district did the math. And Richmond started failing in 2007 and 2008. The NCLB sunsets in 2014 it sunsets in a month. Okay. When you talk about the state of Illinois received a waiver on April 18th 2014 so therefore everything we did in the past is moot. Every state is getting a waiver now. I mean it's just pro forma. We have bet it 100%  two years and you know the experiment is over. The 12 year experiment started by the Bush administration is done. Now are there flaws in the law? Absolutely. I mean when the federal government devises a system of education that where the states need money they have to adopt these rules are there going to be flaws? Absolutely. Does that give them the right to circumvent the law? Counselor you don't sound very optimistic. Sorry ma'am? You don't sound very optimistic. With regard to? The concept that there has to be flaws. I would like to think that there could be a perfect law written sometime relative to education. Nationwide? That's perhaps I'm more cynical than you but that's a tall order. Well if in fact it's sunset relative to the federal law does that automatically sunset the provisions in the school code? The state school code? At the end of the school year yes your honor. That's why they got the waiver. That's why every state is getting a waiver who has not received a waiver yet. Well what I'm suggesting to you is are you saying that because the federal law has a sunset provision does the state Illinois state code also have a sunset provision in it? Not specifically although your honor the 3.25d adopts by you know identical in terms of regulations with regard to that. So technically you can make the argument that it does but at the same time if you look at the waiver that they submitted in their motion to dismiss the ISB says well we're going to monitor this and you can't it doesn't mean you can't do this. It's a situation that's that's fluid that's going to be determined on a case-by-case basis. Are you saying that the state code incorporates by reference the sunset because of the sunset contained in the federal statute? Yes your honor. Thank you. If I may the question is if there is a sunset for purposes of future enforcement the issue is moved? I can't say that definitively because I think it's up to what the state does with regards to the state could extend certain features of the program and I think too it's also dependent on what the federal government does. We have now this common core standard and whether or not that's codified and a new 12 year experiment is thrown out there I'm not sure what's going to happen. But I would submit to the court that what happens two weeks ago, two months from now, two years from now, has no bearing as to whether or not this defendant filed the law in 2011, 12, 13 and 14. And the fact that there's a sunset provision does not give them the right to say well, you know, we might have violated the law for the last four years. So I would like a short response if I could. I would also like to say that Mr. Eisenman stood up here and said, you know, your Honor, I'm sorry, I'm sorry, I wore old names. He said that, well, maybe two-thirds, he said that in 2011, the district had the option of doing three things. Well, if you look at their brief, they say we could have done nothing and been in compliance with the law. I mean, which one is it? I mean, and out of those three things, what did you have to do? Well, obviously, you had to file the order as the circuit court found. Your Honor asked Mr. Eisenman repeatedly, what do you disagree with in the order absent the legal conclusions? And he didn't give you one example of what the district was required to do that they didn't do. He didn't take on the conclusion by the   we should have done the same in order to circumvent those regulations. It's just not acceptable. So from your perspective, the remedy that Judge Ackman should have granted is what? As Justice McLaren said, I think the train should have gone back to the station. Because the whole plan was promised upon the reconfiguration. Mr. Eisenman told the court that without the reconfiguration we couldn't get any relief from the ISBE. And then he said the relief we got from the ISBE was acceptable. But he couldn't give you the statute. He gave you some guidance documents that he didn't provide. So you're saying the old Davis should be the old Davis and the old Richmond should be the old Richmond? Yes, sir. And in the alternative, the school district should have been ordered to undertake a major restructuring in Richmond given the fact that they failed AYP for six consecutive years when the trial court rendered its decision. The trial court acknowledged that, but again fashioned the remedy that it thought was more appropriate or I think the court was a better way. The law does not allow for that. And then Davis is a very hard standard to reach. It's an extraordinary writ. And basically you're saying that the government didn't do what they were required to do. The court acknowledged that, but at the same time didn't require the government to do what they were required to do or in the alternative undo that. Undo what they weren't authorized to do. Exactly, Your Honor. You can close if you would. I don't have any other questions. I'm still befuddled, but I don't have any more questions. I had something very to say and I lost it. It's somewhere on the left there. I don't believe that NCLB sunsets         in 2014. I don't believe that NCLB sunsets in 2014. I don't believe that NCLB sunsets in 2014.    that NCLB does not sunset in 2014. You're saying the federal law does not sunset? I just want to address the remedy issue. At that point, I'm taking that the judge was correct that we had to do something and adopting a corrective action plan wouldn't be a mandatory action under his reasoning. However, what goes into the plan is not mandatory. State boards and school boards are giving multiple options under state and federal law. They can replace  staff, hire an expert, improve new curriculum, decrease management of the schools, which we've now adopted a plan. That plan, because we           have             federal law, is not mandatory. That plan, because we have to do it under federal law, is not mandatory. That              do it under federal law, is not mandatory. That plan, because we have to do it under federal law, is not